**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SANDRA K. JACKSON,                )        CASE NO. 1:12-CV-1523
                                  )
              Plaintiff,          )        JUDGE BOYKO
                                  )
        v.                        )        MAGISTRATE JUDGE
                                  )        VECCHIARELLI
MICHAEL J. ASTRUE,                )
     Commissioner of Social Security,  )
                                  )
              Defendant.          )        **REPORT AND RECOMMENDATION**

        Plaintiff, Sandra K. Jackson ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"),

denying heris applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, *et

seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to an automatic

referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

        On January 11, 2008, Plaintiff filed applications for POD and DIB, alleging a

disability onset date of January 3, 2008 (Transcript ("Tr.") 16.)  The applications were

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id*.)  On November 9, 2010, an ALJ held Plaintiff's

hearing. (*Id*.)  Plaintiff appeared, was represented by a non-attorney representative, and

testified.  (*Id*.)  A vocational expert ("VE") also testified.  (*Id*.)  On April 8, 2011, the ALJ

found that Plaintiff was not disabled.  (*Id*.)  On April 26, 2012, the Appeals Counsel

declined to review the ALJ's decision, and the ALJ's decision became the

Commissioner's final decision.  (Tr. 1.)

On June 14, 2012, Plaintiff filed her complaint to challenge the Commissioner's

final decision.  (Doc. No. 1) On November 26, 2012, Plaintiff filed her Brief on the

Merits.  (Doc. No. 15.)  On January 10, 2013, the Commissioner filed his Brief on the

Merits.  (Doc. No.16.)  On January 14, 2013, Plaintiff filed a Reply Brief.  (Doc. No. 17.)

Plaintiff argues that the ALJ's determination of her residual functional capacity

("RFC") is not supported by substantial evidence because the ALJ failed to: (1) give

good reasons for assigning little weight to the opinions of Plaintiff's treating physicians;

and (2) consider the third-party statements from Plaintiff's coworker and supervisor.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on November 5, 1957.  (Tr. 28.)  She had a college education,

with a degree in education and English/sociology.  (Tr. 46.)  Plaintiff had past relevant

work as a manager for a collections agency.  (Tr. 57-58.)

### B.    Medical Evidence

#### 1.    Treating Providers

An April 19, 2005 x-ray of Plaintiff's cervical spine, taken after an automobile

accident, revealed "early chronic, degenerative disk disease at C5-6 and C6-7 levels, as

shown by some end plate osteophytes."  (Tr. 483.)  An April 22, 2005 x-ray of Plaintiff's

right knee revealed no fracture, dislocation or articular abnormality.  (Tr. 485.)  On December 3, 2005, Plaintiff reported to the emergency room at St. Joseph Medical Center ("St. Joseph") in Towson, Maryland, complaining of severe chest discomfort and nausea.  (Tr. 490.)  An electrocardiogram suggested that she had experienced an acute high lateral myocardial infarction.  (Tr. 470.)  She was admitted and underwent a catheterization and stenting procedure.  (Tr. 491.) Plaintiff was discharged on December 5, 2005.  (*Id*.) The discharge summary notes that Plaintiff reported having a high stress job as an administrative manager at a collections agency, and smoking one to one and one-half packs of cigarettes each day.  (Tr. 469.)

On December 26, 2005, Plaintiff returned to St. Joseph, complaining of chest discomfort radiating to her arms and back.  (Tr. 475.)  A December 26, 2005 chest x-ray revealed no mass, infiltrate or effusion.  (Tr. 487.)  Physicians diagnosed Plaintiff with unstable angina, coronary artery disease, hypertension and hypercholesterolemia, and ruled out myocardial infarction.  (Tr. 473, 476.)  She underwent a second stenting procedure.  (Tr. 475-76.)  She was discharged on December 28, 2005 in stable condition.  (Tr. 475.)

On August 22, 2006, Plaintiff returned to St. Joseph, complaining of fatigue, chest heaviness with exertion and right arm tingling.  (Tr. 479.)  She underwent a catheterization and a third stenting procedure.  (Tr. 466-67.)

A January 1, 2007 x-ray of Plaintiff's right knee reveled soft tissue swelling and a "very tiny density projected over the lateral knee joint compartment."  (Tr. 488.)  The study, however, showed no significant bony abnormality, and the joint space was intact and well maintained.  (*Id*.)

3

On January 3, 2008, Plaintiff presented to the emergency department at Lake Hospital, complaining of chest pain.  (Tr. 685.)  She was admitted and diagnosed with an acute inferior wall myocardial infarction, atherosclerotic heart disease, hypertension, hyperlipidemia and tobacco abuse.  (*Id*.)  She underwent a catheterization and stenting procedure.  (Tr. 685-86.)  She was discharged on January 7, 2008, with instructions to avoid heavy exertion for one week and then gradually increase to normal activity.  (Tr. 686.)  She was prescribed Aspirin, Plavix, a beta blocker, an ACE inhibitor, a cholesterol medication, and Ativan.  (Tr. 686.)

On April 27, 2008, Plaintiff presented to the emergency department at Lake Hospital via EMS, complaining of palpitations brought on by emotional upset.  (Tr. 793.)  She also reported shortness of breath.  (Tr. 795.)  Emergency department personnel diagnosed her with palpitations and anxiety, and discharged her in stable condition with a prescription for Ativan.  (Tr. 799.)

On May 13, 2008, Plaintiff reported to her primary care physician, Gary L. Stabler, D.O., that she was depressed and unable to "drive on freeways," was fatigued, experienced pain in her left knee and back, and had high blood pressure.  (Tr. 752.)  He prescribed her Lexapro, and ordered blood tests.  (*Id.*)

On May 15, 2008, John A. Samsa, D.O., who had treated Plaintiff in Lake Hospital and thereafter, reported to the agency that Plaintiff experienced chest discomfort and dyspnea on exertion, but not at rest.  (Tr. 710-11.)  Five to ten minutes of rest alleviated the discomfort and dyspnea.  (Tr. 711.)  Dr. Samsa opined that Plaintiff had coronary artery disease.  (*Id.*)  He also noted that Plaintiff was not "experiencing optimal benefit" from her treatment because she needed "to improve her b[lood]

4

p[ressure]" and "stop smoking cigarettes."  (Tr. 712.)

On May 29, 2008, Plaintiff complained of low back pain to Dr. Stabler.  (Tr. 752.) Dr. Stabler prescribed Plaintiff Percocet and Norvasc, and directed her to obtain an x-ray of her lumbosacral spine.  (*Id*.)

On June 17, 2008, Plaintiff reported to Dr. Stabler that she had diarrhea and had frequent bowel movements.  (Tr. 751.)  Dr. Stabler diagnosed her with gastroenteritis. (*Id*.)  On June 26, 2008, she reported that she was still experiencing frequent bowel movements and diarrhea.  (*Id*.)  She was scheduled to see a specialist on July 1, 2008. (*Id*.)  A July 1, 2008 x-ray of Plaintiff's thoracic spine was negative for any abnormalities. (Tr. 790.)  A July 10, 2008 x-ray of Plaintiff's lumbosacral spine revealed lumbar scoliosis with convexity to the left in the apex at L3.  (Tr. 725.)  The interpreting physician characterized the x-ray as showing "mild to moderate degenerative change" in Plaintiff's lumbar spine.  (*Id*.)

On July 17, 2008, Plaintiff reported to Dr. Stabler that she as concerned about her weight, shortness of breath and sensitivity to smells.  (Tr. 750.)  She also complained of knee pain.  (*Id*.)  Dr. Stabler ordered a chest x-ray and referred Plaintiff to Dr. Samsa.  (*Id*.)  Plaintiff's July 17, 2008 chest x-ray revealed no abnormalities.  (Tr. 789.)  On July 24, 2008, Dr. Stabler noted increased bowel sounds, and diagnosed Plaintiff with irritable bowel syndrome ("IBS").  (Tr. 749.)  Plaintiff complained of knee pain, so he directed her to obtain an x-ray of her knees.  (*Id*.)

On August 13, 2008, Plaintiff was examined by Kathleen Allen, a professional clinical counselor at North Coast Center.  (Tr. 818.)  Plaintiff described the main sources

5

of stress in her life as her family and her health problems.  (*Id*.)  Ms. Allen diagnosed Plaintiff with adjustment disorder.  (*Id*.)

On August 21, 2008, Plaintiff arrived via EMS at Lake Hospital, complaining of palpitations and a rapid heart rate.  (Tr. 780.)  She complained of feeling nervous and jittery and reported that she was out of Ativan.  (Tr. 780, 782.)  A chest x-ray revealed no abnormalities.  (Tr. 788.)  Plaintiff reported feeling better after receiving Ativan, and was discharged in stable condition.  (*Id*.)

An August 29, 2008 x-ray of Plaintiff's knees revealed "no evidence of fracture, dislocation, or other bony abnormalities."  (Tr. 775.)

On September 2, 2008, Plaintiff was examined by Dean C. Pahr, D.O, a pain management specialist, who noted her complaints of chronic back pain, which she rated at 7 to 9 out of ten.  (Tr. 802.)  He diagnosed her with lumbar sprain/strain and lumbar radiculitis.  (*Id*.)  Dr. Pahr recommended that Plaintiff obtain an MRI of her lumbar spine, and continue taking Percocet.  (*Id*.)  On September 4, 2008, Dr. Stabler switched Plaintiff's prescription to Zoloft.  (Tr. 857.)4

On September 24, 2008, Plaintiff was examined by John H. Paul, M.D., an orthopedic surgeon, who noted her complaint of left knee pain ranging from 5 to7 out of 10.  (Tr. 997.)  He noted that his examination was positive for a torn medial meniscus.  (*Id*.)  He diagnosed acute internal derangement of the left knee joint, and instructed Plaintiff to obtain an MRI and an x-ray and return.  (Tr. 997-98.)

On September 29, 2008, Plaintiff was assessed by Robin Krause, a psychiatric advanced practice nurse at North Coast Center, who noted Plaintiff's description of

6

feeling depressed and anxious about her health, and her family's health and financial problems.  (Tr. 815.)  Nurse Krause noted that Plaintiff was coherent, and that her insight, judgment and reasoning were fair.  (Tr. 816.)   Nurse Krause diagnosed Plaintiff with generalized anxiety disorder, but noted that Plaintiff exhibited some signs of bipolar disorder.  (*Id*.)  She instructed Plaintiff to take Celexa that had been prescribed by Dr. Stabler, and to continue seeing Ms. Allen for therapy, noting that Plaintiff had missed several appointments.  (*Id*.)  Plaintiff attended counseling sessions with Ms. Allen on October 1 and October 14, 2008, where she discussed the sources of her stress and anxiety, and a plan for addressing them.  (Tr. 813-14.)  Plaintiff failed to show for an appointment scheduled in late October 2008.  (Tr. 840.)

On October 21, 2008, Plaintiff arrived at the Lake Hospital emergency department via EMS, complaining of chest pains and shortness of breath originating after an argument between her son and her ex-husband.  (Tr. 823.)  An EKG revealed a normal sinus rhythm, with some left atrial enlargement and left ventricular hypertrophy.  (Tr. 831.)  Plaintiff underwent a stress test, which reflected an average functional aerobic capacity, normal heart recovery, and no clinical evidence of ischemia.  (Tr. 872.)  Dr. Samsa, who examined Plaintiff in the hospital, attributed the chest pain to the stress that Plaintiff experienced as a result of the argument.  (Tr. 825.)  He directed her to continue her medications as prescribed.  (*Id*.)  Plaintiff was discharged in stable condition.  (Tr. 826.)

On December 4, 2008, Plaintiff complained to Dr. Stabler of lower left quadrant pain.  (Tr. 935.)  On December 22, 2008, Plaintiff reported to the emergency department at Lake Hospital, complaining of pain and spasms in the left side of her neck. (Tr. 911.)

7

She was given Flexeril, a muscle relaxant, and was discharged.  (Tr. 913.)

On January 8, 2009, Plaintiff complained to Dr. Stabler of shortness of breath on exertion, pain in her femoral artery after working, and a lack of endurance at work.  (Tr. 937.)

A January 26, 2009 CT scan of Plaintiff's lumbosacral spine revealed moderate-sized axial defects at the thecal sac at the L2-L3 and L3-L4 levels with narrowing of the disc spaces, as well as degenerative changes involving the lumbosacral spine with minimal spondylolisthesis at L4-L5.  (Tr. 907-08.)

In February 2009, Plaintiff reported to Dr. Stabler that she had a "pulled muscle feeling all over [her] upper body," a "jumpy" and "twitching" sensation in her heart, weakness in her arms and pain in her joints.  (Tr. 938.)  On March 13, 2009, Dr. Stabler noted Plaintiff's complaint of fatigue and aching in her knees.  (Tr. 939.)

On March 25, 2009, Certified Nurse Practitioner Tiffany A. Love, summarizing Plaintiff's examination by cardiologist Thomas S. Wilson, M.D., noted that Plaintiff had no evidence of ischemia, and indicated that Plaintiff was to remain on the therapy already prescribed.  (Tr. 885.)

On March 29, 2009, Plaintiff reported to the Lake Hospital emergency department, complaining of chest discomfort.  (Tr. 866.)  She also reported chronic nausea and diarrhea, as well as depression.  (*Id*.)  Dr. Samsa diagnosed Plaintiff with atypical chest pain, atherosclerotic heart disease, hypertension, hyperlipidemia, IBS and depression.  (Tr. 867.)  He prescribed her a topical nitroglycerin patch.  (*Id*.)  She was discharged in stable condition.  (*Id*.)

On July 31, 2009, Plaintiff was assessed by Christine George, MA, LSW,LPC, a

8

counselor at Neighboring Mental Health Services ("Neighboring").  (Tr. 955-66.)  Ms. George reported that Plaintiff had a logical thought process, full affect and a depressed mood.  (Tr. 964.)  Plaintiff was cooperative and pleasant.  (*Id.*)  Ms. George diagnosed Plaintiff with panic disorder without agoraphobia, an unspecified mood disorder, and trichotillomania.[1]  (Tr. 965.)

On September 15, 2009, Plaintiff reported to Dr. Stabler that she had experienced two fainting spells at work, as well as pain in both her knees.  (Tr. 970.)

On November 3, 2009, Plaintiff was examined by James H. Walker, M.D., an orthopedic surgeon, who noted her complaint of bilateral knee pain.  (Tr. 1011.)  Dr. Walker's examination revealed a full range of motion and "excellent" stability.  (*Id.*)  He observed that her x-rays "look perfect" and opined that Plaintiff "may have some fibromyalgia" and recommended that she undergo physical therapy.  (*Id.*)  Plaintiff "requested some Percocet:" Dr. Walker "told her this is not the way to deal with this." (*Id.*)  Plaintiff failed to show for an appointment in December 2009.  (*Id.*)

On November 9, 2009, Plaintiff presented to the Lake Hospital emergency department, complaining of anxiety.  (Tr. 975.)  She explained to medical personnel that she was out of Ativan and required a prescription until she saw Dr. Stabler.  (*Id.*)  She was diagnosed with anxiety, prescribed Ativan, and discharged.  (Tr. 977.)

On November 13, 2009, Plaintiff underwent a 24-hour ambulatory EKG after

---

[1]    Trichotillomania is the "compulsive pulling out of one's hair, associated with tension or an irresistible urge before pulling and followed by pleasure or relief."  *Dorland's Illustrated Medical Dictionary* 1947 (Saunders, 30th ed. 2003).  Plaintiff reported that she would pull her eyelashes out when stressed, anxious or frustrated.  (Tr. 965.)

complaining of palpitations.  (Tr. 982-83.)  Dr. Wilson reported a regular rhythm, with isolated premature atrial contractions ("PACs") averaging nine per hour, premature ventricular contractions ("PVCs") averaging less than two per hour, and no tachycardia. (Tr. 983.)  After a second 23-hour monitoring period in December 2009, Dr. Samsa reported normal sinus rhythm with occasional PACs and PVCs.  (Tr. 991.)

On November 16, 2009, Neighboring placed Plaintiff on inactive status, noting that she had failed to attend appointments for three weeks in a row.  (Tr. 1000.)

In November and December 2009, Plaintiff complained to Dr. Stabler of shortness of breath, pain in her right foot, and tightness and pain in her stomach.  (Tr. 994-95.)  Dr. Stabler diagnosed Plaintiff with gastroesophageal reflux disease ("GERD") and prescribed Zantac.  (Tr. 994.)

On April 14, 2010, Plaintiff was examined by M.P. Patel, M.D., after injuring her back while trying to pick up and fix a rack of clothing at work on March 19, 2010.  (Tr. 1126.)  Plaintiff described sharp, burning pain over her lumbar spine and extending to both sides of the spine, rated at a 7 out of 10.  (*Id*.)  She reported that the pain was exacerbated by bending, lifting, sitting and standing, and that she experienced numbness in her legs and toes.  (*Id*.)  Dr. Patel's examination revealed muscle spasms, restricted range of motion and low back pain.  (Tr. 1127.)  Dr. Patel diagnosed Plaintiff with lumbosacral sprain/strain causally related to her work injury.  (*Id*.)  He prescribed Vicodin, Flexeril, a lumbar back brace and physical therapy.  (*Id*.)  He opined that Plaintiff could continue light duty work with alternate sitting and standing during work duties.  (*Id*.)

Throughout April and May 2010, Plaintiff treated with Dr. Patel, complaining of

10

constant low back pain that radiated to her legs, hips and thighs, and increased with bending, lifting, standing and walking.  (Tr. 1118-25.)  Dr. Patel increased Plaintiff's pain medications.  (Tr. 1118, 1120, 1122.)

On May 8, 2010, Plaintiff reported to the Lake Hospital emergency department, complaining of chest pain and anxiety.  (Tr. 1067-69.)  She reported that her anxiety had increased after Dr. Stabler decreased her Ativan prescription.  (Tr. 1067.)  She was afraid to go to sleep and feared that she would have another heart attack.  (*Id*.)  Tests revealed no evidence of ischemia.  (Tr. 1065, 1073.)  Plaintiff was discharged on May 10, 2010 in stable condition.  (Tr. 1065.)

In June 2010, Dr. Patel noted Plaintiff's complaint of moderate recurring low back pain that was variable in nature and degree.  (Tr. 1116.)  The pain continued to increase on walking or standing.  (*Id*.)  He continued Plaintiff's Vicodin and Flexeril and recommended she perform stretching, mobilizing and strengthening exercises at home.  (*Id*.)  Plaintiff continued to report low back pain throughout June and July 2010.  (Tr. 1054-55, 1114-15.)

On June 24, 2010, Plaintiff was examined by Ruth Martin, M.D., a psychiatrist at Neighboring Health Center.  (Tr. 1154-56.)  After reviewing Plaintiff's personal and medical history, Dr. Martin diagnosed her with recurrent depression, and assigned her a Global Assessment of Functioning ("GAF") score of 60.  (Tr. 1155.)  Dr. Martin prescribed Pristique.  (*Id*.)

A July 13, 2010 CT scan of Plaintiff's lumbar spine revealed mild to moderate stenosis at the L2-L3, L3-L4 and L4-L5 levels, and left neural foraminal stenosis at the L2-L3 level.  (Tr. 1057-58.)

11

On August 2, 2010, Plaintiff reported to Dr. Patel that she had injured her right shoulder while rolling a cart of hangers at work.  (Tr. 1112-13.)  She complained of sharp pain over her right shoulder that was increased with motion.  (Tr. 1112.)  The pain spread down into her right upper arm, elbow and forearm.  (*Id*.)  Dr. Patel's examination revealed tenderness and a limited range of motion.  (*Id*.)  He diagnosed her with sprain/strain of the right shoulder, causally related to her work injury.  (Tr. 1113.)  He prescribed Flexeril, therapy with electrical stimulation and exercises.  (*Id*.)

Plaintiff continued to treat with Dr. Patel for low back pain and right shoulder pain throughout August and September 2010.  (Tr. 1105-11.)  He noted her complaints that her back pain increased in the morning with "significant stiffness," and that her shoulder pain increased with overhead work.  (Tr. 1109, 1110.)   He recommended that she continue with her home exercises.  (Tr. 1107.)

On September 14, 2010, Plaintiff reported to the Lake Hospital emergency department, complaining of abdominal pain and nausea after taking Bactrim to treat an abscess near her tail bone.  (Tr. 1087.)  She was treated with Zofran, an anti-nausea medication, and discharged in stable condition.  (Tr. 1089.)

On November 11, 2010, Plaintiff reported to the Lake Health emergency department, complaining of face swelling and depression.  (Tr. 1158.)  Medical personnel diagnosed her with anxiety and sinusitis, and prescribed Ativan and antibiotics.  (*Id*.)  On November 18, 2010, Plaintiff returned to the Lake Health emergency department, reporting that she had fallen and injured her left knee.  (Tr. 1177.)  Emergency department personnel diagnosed her with a left knee sprain and hematoma, and instructed her to treat her knee with cool packs.  (Tr. 1176.)

### 2.    Treating Physician Statements

On July 6, 2010, Dr. Stabler completed a form entitled "Medical Statement: Inflammatory Bowel Disease," in which he noted that Plaintiff experienced bloating, diarrhea and cramps.  (Tr. 1026-28.)  He opined that her prognosis was poor, and listed the following conditions: IBS; chronic severe diarrhea, recurrent bloody stools documented or on repeated examinations; evidence of IBS on endoscopy; abdominal pain; and urinary tract difficulties.  (Tr. 1026.)  Dr. Stabler stated that: Plaintiff was not a malingerer; her impairments had lasted or could be expected to last at least twelve months; emotional factors contributed to the severity of her symptoms and functional limitations; and her impairments were reasonably consistent with her symptoms and functional limitations.  (Tr. 1026-27.)  According to Dr. Stabler, Plaintiff's pain and other symptoms were "frequently" severe enough to interfere with her attention and concentration, and she was "incapable of even low stress jobs."  (Tr. 1027.)

Dr. Stabler assigned Plaintiff the following limitations: sitting or standing for no more than 15 minutes at a time; standing/walking for no more than two hours in an eight-hour workday; frequently lifting less than ten pounds; never lifting ten pounds or more; requires the ability to shift positions at will from standing, sitting or walking; ready access to a restroom; requires the ability to take unscheduled restroom breaks.  (Tr. 1027-28.)  Dr. Stabler opined that Plaintiff would require a restroom break every 15 minutes, and would have approximately two to five minutes of advance notice of her need for such a break.  (Tr. 1028.)

On that same date, Dr. Stabler also completed a form entitled "Pain Questionnaire."  (Tr. 1031.)  He reported that Plaintiff had the following mental and

13

physical impairments that were capable of producing pain: panic attacks, degenerative joint disease, arthritis and depression.  (*Id*.)  Plaintiff's subjective complaints included severe cramping and diarrhea, lumbago, pain and panic.  (*Id*.)  He opined that Plaintiff's subjective complaints were reasonably derived from her underlying conditions, and listed Plaintiff's joint stiffness, diarrhea, headache, depression and panic as his clinical and objective findings.  (*Id*.)  Dr. Stabler reported that Plaintiff's pain and severe diarrhea affected her ability to perform basic work-related activities.  (*Id*.)

Dr. Stabler also completed a form entitled "Medical Statement Concerning Depression with Anxiety, OCD, PTSD, or Panic Disorder."  (Tr. 1032-33.)  He noted that her signs and symptoms included: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; decreased energy; difficulty concentrating or thinking; hallucinations, delusions or paranoid thinking; motor tension; apprehensive expectations, persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation; recurrent obsessions or compulsions which are a source of marked distress; psychomotor agitation or retardation; feelings of guilt or worthlessness; thoughts of suicide; generalized persistent anxiety; autonomic hyperactivity; vigilance and scanning; current severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least one a week; and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.  (Tr. 1032.)  Dr. Stabler opined that Plaintiff was extremely limited in her activities of daily living and in maintaining social functioning, and that she had experienced: deficiencies of concentration, persistence or pace resulting in

frequent failure to complete tasks in a timely manner; repeated episodes of deterioration or decompensation in work or work-like settings which cause the patient to withdraw from the situation or experience exacerbation of signs and symptoms; and the complete inability to function independently outside the area of the patient's home due to panic attacks.  (*Id*.)

Dr. Stabler reported that Plaintiff was extremely limited in the ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 1033.)  Dr. Stabler opined that Plaintiff was markedly limited in the ability to: understand and remember short and simple instructions; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and interact appropriately with the general public.  (*Id*.)

According to Dr. Stabler, Plaintiff was moderately limited in her ability to: remember locations and work-like procedures; work in coordination with and proximity with others without being distracted by them; make simple, work-related decisions; and ask simple questions or request assistance.  (*Id*.)  He opined that she was mildly limited in her ability to: carry out very short and simple instructions; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

15

respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions.  (*Id*.)  He predicted that Plaintiff's impairments would cause her to be absent from work more than three times per month.  (*Id*.)

On September 22, 2010, Ms. George and Dr. Martin completed a form entitled "Assessment of Ability to Do Work-Related Activities (Mental)."  (Tr. 1060-61.)  They opined that Plaintiff had marked restrictions in: daily activities; personal habits; as well as in her ability to: maintain concentration and attention for extended periods;  sustain a routine without special supervision; perform activities within a schedule; maintain regular attendance; be punctual; understand, carry out and remember instructions; use good judgment; and behave in an emotionally stable manner.  (Tr. 1060-61.)  They reported that Plaintiff was moderately limited in her ability to: respond to customary work pressures; respond appropriately to changes in the work setting; and perform complex, repetitive or varied tasks.  (*Id*.)  They determined that Plaintiff was mildly restricted in her ability to relate to other people. (*Id*.)  They opined that Plaintiff's condition would likely deteriorate if she were placed under stress, especially that of a job, and that her impairments would cause her to be absent from work more than three times per month. (Tr. 1061.)

On September 27, 2010, Dr. Samsa completed a form entitled "Cardiac Residual Functional Capacity Questionnaire," in which he noted Plaintiff's diagnosis of atheroscleric heart disease, with symptoms of chest pain, palpitations and fatigue/dizziness.  (Tr. 1095.)  He reported that he had not seen Plaintiff for more than one year, and, thus, noted that it was "unclear" whether stress brought on her symptoms, and that he was "unsure" to what degree she could tolerate work stress.  (Tr.

1095-96.)  He opined that Plaintiff's experience of cardiac symptoms would frequently interfere with her concentration and attention, and that she had a "fair" prognosis.  (Tr. 1096.)

Dr. Samsa opined that Plaintiff could stand or walk for less than two hours in an eight-hour day, and could sit for about two hours in an eight-hour day.  (Tr. 1096.)  He predicted that she would require two or three unscheduled breaks of about 15 minutes each workday.  (Tr. 1097.)  He determined that she could occasionally lift up to 10 pounds, and should never lift greater than 10 pounds, and that she should avoid concentrated exposure to extreme heat, extreme cold, fumes, odors, dusts, gases, poor ventilation and hazards.  (*Id*.)  Dr. Samsa opined that Plaintiff's impairments would cause her to miss work more than four times each month.  (*Id*.)

### 3.  Agency Reports and Assessments

On July 10, 2008, clinical psychologist Richard C. Halas, M.A., examined Plaintiff at the request of the agency.  (Tr. 727-30.)  Dr. Halas described Plaintiff as tense, tearful and anxious, but noted that she was cooperative and exhibited appropriate behavior.  (Tr. 727.)  He concluded that her level of intelligence was average to slightly above average, and noted that her thinking was more concrete than abstract.  (Tr. 728.)  Dr. Halas diagnosed Plaintiff with depressive disorder not otherwise specified and general anxiety disorder with occasional panic attacks.  (Tr. 730.)  He assigned her a GAF score of 45 for serious symptoms and 65 for her functional severity.  (*Id*.)  He assigned her the following limitations: moderate impairment in her ability to relate to others, including peers, supervisors and the general public; marked impairment in her

17

ability to withstand stresses and pressures associated with most day-to-day work; no impairment to her ability to follow through with simple instructions and to maintain attention and perform simple, repetitive tasks.  (*Id*.)

On August 5, 2008, agency consultant Karen Terry, Ph.D., performed a psychiatric review technique and a mental RFC assessment.  (Tr. 753-66, 767-70.)  Dr. Terry opined that Plaintiff had depressive disorder not otherwise specified and generalized anxiety disorder.  (Tr. 756, 758.)  She determined that Plaintiff was mildly impaired in her activities of daily living, and moderately impaired in social functioning and maintaining concentration, persistence and pace.  (Tr. 763.)  She determined that Plaintiff was moderately impaired in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  (Tr. 767-68.)  Dr. Terry did not assign Plaintiff a marked limitation in any category.  Although Dr. Terry generally accepted Dr. Halas's opinions, she disagreed with his determination that Plaintiff was markedly limited in her ability to handle the stress of work.  (Tr. 769.)  Dr. Terry noted that Plaintiff "retains the ability to perform mildly complex tasks in a routine, static and predictable work setting that doesn't require strict production quotas or fact paced performance and requires her to have only

18

superficial contact with others." (*Id*.)

On September 4, 2008, agency consultant Willa Caldwell, M.D., performed a physical RFC assessment. (Tr. 803-10.) She opined that Plaintiff could: occasionally lift 20 pounds; frequently lift ten pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; never balance; and occasionally kneel and crawl. (Tr. 804-07.)

On December 31, 2008, agency consulting psychologist Alice Chambly, Psy. D., affirmed Dr. Terry's mental RFC assessment. (Tr. 863.) Dr. Chambly noted Dr. Halas's opinion regarding Plaintiff's ability to withstand the stress of working, but noted that "there was little objective evidence supporting stress tolerance limitations to this degree. [Plaintiff] was not involved in any psych treatment. She had not required emergency psych treatment nor had she had any episodes of deterioration. She is no more than moderately limited in this area." (*Id*.) On January 21, 2009, agency consulting physician Paul Morton, M.D., affirmed Dr. Caldwell's physical RFC assessment. (Tr. 864.)

### 4.    Plaintiff and Third-Party Statements

In a November 24, 2008 function report, Plaintiff reported that she helped care for her husband after he received electroshock therapy by giving him a pillow or a drink. (Tr. 363.) She cared for the family's pets by making certain they had water and food. (*Id*.) Plaintiff reported that she was able to drive and ride in a car, and use public transportation. (Tr. 364.)

In an October 12, 2010 statement, Plaintiff's former coworker, Miranda P. Rings,

19

reported that she had worked with Plaintiff at K-Mart.  (Tr. 406.)  She noted that Plaintiff took many unscheduled breaks, which Ms. Rings believed were related to her stomach pains.  (*Id*.)  Plaintiff experienced shortness of breath and fought with store personnel about her medications and her job duties.  (*Id*.)  Ms. Rings reported that Plaintiff became overwhelmed and cried during work hours, and was "emotional."  (Tr. 407.)  Plaintiff was forgetful and lost items, including an expensive piece of inventory equipment.  (*Id*.)  According to Ms. Rings, Plaintiff "seemed to get hurt [a lot], whether it was a cut, trip over things, and her back."  (*Id*.)

In a November 29, 2010 statement, Lori Hyatt reported that she had been Plaintiff's supervisor at K-Mart.  (Tr. 409.)  Plaintiff's duties consisted of folding and straightening clothing, as well as assisting customers.  (*Id*.)  According to Ms. Hyatt, Plaintiff would take three or four unscheduled breaks during a shift because Plaintiff "had to sit and take her meds" and "because her feet and legs hurt."  (*Id*.) Ms. Hyatt stated that Plaintiff "had a hard time understanding and had to be told over and over before she understood.  Due to her medication, she was not always with it."  (*Id*.) Plaintiff was emotional, coming to work "crying and upset because she was so ill most of the time."  (Tr. 410.)  Ms. Hyatt would assist Plaintiff with her job duties "so we could get out of work on time."  (*Id*.)  According to Ms. Hyatt, Plaintiff had been reassigned to a door greeter position, which allowed Plaintiff to alternate between sitting and standing. (*Id*.)  However, Plaintiff was frequently not able to complete her four-hour shift "because she is in so much pain."  (*Id*.)

20

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

At her November 9, 2010 administrative hearing, Plaintiff testified as follows:

She lived with her husband and son.  (Tr. 46.)  She began working part time at K-Mart in November 2008 because she needed a job that provided benefits.  (Tr. 47.)  She worked in the clothing department, where she assisted customers, straightened clothing, hung clothing up and sold jewelry.  (*Id.*)  Initially, she was working 20 to 25 hours per week, but eventually asked for a reduction to 15 to 20 hours because "it was too much for me to do that kind of job and I . . . couldn't breathe."  (Tr. 48-49.)  Although she was supposed to stand during her entire shift, she would occasionally sneak into a dressing room to sit.  (Tr. 49.)  She was forgetful at work, losing an RMU device, leaving her keys to jewelry case on the jewelry counter, and misplacing her medications.  (Tr. 49-50.)  She felt that her coworkers at K-Mart "looked out" for her and "protected" her by not telling management about her mistakes.  (Tr. 50.)  At the time of the hearing, Plaintiff was working as a greeter at K-Mart, a position that allowed her to alternate between sitting and standing.  (Tr. 55.)  If she sat for more than two hours at a time or stood for more than 45 minutes, her back hurt.  (*Id.*)

Plaintiff smoked a half a pack of cigarettes each week, smoking when she was stressed.  (Tr. 56.)  She drove three to five times each week.  (Tr. 56-57.)  She experienced chest pain and became winded with too much exertion, such as walking around her house or K-Mart too much.  (Tr. 58.)  She could walk for five minutes without needing to stop, and could not "do steps at all."  (Tr. 58.)  If she stood for too long, she

began to feel faint.  (Tr. 59.)  The only thing that relieved her back pain was a heating pad set at the highest setting.  (Tr. 62.)  She experienced chest pain three times each week.  (Tr. 64.)

When Plaintiff experienced a bout of her IBS, she would need to use the restroom 13 or 14 times in a nine-hour span.  (Tr. 65.)  Plaintiff frequently called off work because of her IBS.  (Tr. 65-66.)  The pain in her knees woke her up at night.  (Tr. 66-67.)

Plaintiff began to experience severe depression after her third heart attack in January 2008.  (Tr. 69.)  She experienced panic attacks, and had once called 911 from the parking lot of a Wal Mart, caused by "the hustle and bustle of the people and the bright lights and the commotion and just everybody being so functional and me so dysfunctional."  (Tr. 70.)  Plaintiff experienced two or three panic attacks in a "bad month."  (Tr. 72.)  She was frightened to drive on the freeway.  (Tr. 71.)  Although she could not shop at large grocery stores, she shopped for laundry soap and pet food at Family Dollar.  (Tr. 76-77.)  She occasionally went into "avoidance mode" where she would avoid talking to her friends.  (Tr. 77.)  She "faked it" at work as a greeter because she didn't know any of the people she was greeting.  (Tr. 77-78.)  Plaintiff used to read, but had lost interest.  (Tr. 78.)

### 2.   VE Testimony

The ALJ posed the following hypothetical to the VE:

> In this . . . hypothetical, the [hypothetical individual] can sit, stand and/or walk six hours each through the course of an eight-hour day, lift up to ten pounds frequently and 20 pounds occasionally.  No ladders, ropes or scaffolds. Occasional stair and ramps and kneeling and crawling.

* * *

> [A]dd the further limitation that such an individual would be
> limited to low stress tasks, [defined as] no high production
> quotas such a piecework or assembly line work, strict time
> requirements, arbitration, negotiation, confrontation,
> directing work of others or being responsible for others.
> [L]imit this person to routine tasks and a static predictable
> work setting.  And lastly limit them to tasks with superficial
> interaction with supervisors, coworkers and the public.

(Tr. 91-92.)  The VE opined that the hypothetical could not perform Plaintiff's past work, but could perform work as a housekeeper or fast food worker.  (Tr. 92-93.)  The VE testified that, if the ALJ added the additional limitation that the hypothetical individual would be off task 20% of the time or more, there were no jobs that the hypothetical individual could perform.  (Tr. 94.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks

23

disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant

must show that she suffers from a "severe impairment" in order to warrant a finding of

disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905

F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a

severe impairment that is expected to last for at least twelve months, and the

impairment meets a listed impairment, the claimant is presumed to be disabled

regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and*

416.920(d). Fourth, if the claimant's impairment does not prevent him from doing her

past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and*

416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§

404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Plaintiff meets the insured status requirements of the Act through
     December 31, 2013.

2.   Plaintiff has not engaged in substantial gainful activity since January 3,
     2008, the alleged onset date.

3.   Plaintiff has the following severe impairments: coronary artery disease,
     status-post myocardial infarction and stent placements, hypertension,
     lumbosacral sprain/strain, fibromyalgia, gastroesophageal reflux disease
     (GERD), irritable bowel syndrome (IBS), depressive disorder, NOS,
     degenerative joint disease of the knees and generalized anxiety disorder.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that Plaintiff has the RFC to perform light work as defined in 20 CFR §§ 404.1567(b) except Plaintiff can never climb ladders, ropes and scaffolds; can only occasionally kneel, crawl, climb ramps and stairs; is limited to performing routine tasks; can have only superficial interaction with supervisors, co-workers and the public; and is limited to low stress tasks that preclude strict time requirements, arbitrations, negotiation, confrontation, directing the work of others, being responsible for the safety of others and high production quotas such as piece work or assembly line work.

6.  Plaintiff is unable to perform any past relevant work.

7.  Plaintiff was born on November 5, 1957 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8.  Plaintiff has at least a high school education and is able to communicate in English.

*    *    *

10.  Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.  Plaintiff has not been under a disability, as defined in the Act, from January 3, 2008, through the date of this decision.

(Tr. 18-30.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy, 594 F.3d at 512*.

### B.  Plaintiff's Arguments

Plaintiff argues that the ALJ violated the treating physician rule by failing to give good reasons for assigning little weight to the opinions of Plaintiff's treating physicians, and that the ALJ erred as a matter of law by failing to consider the statements from Plaintiff's coworker and supervisor at K-Mart.  The Commissioner argues that the ALJ sufficiently explained her decision to assign little weight to the physicians' opinions, and that, because the third-party statements were duplicative of other evidence in the

record, the ALJ did not err in declining to discuss them.  This Court will discuss each argument in turn.

### 1.    Whether the ALJ Violated the Treating Physician Rule

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, although she acknowledged that Plaintiff had a treating relationship with

27

Drs. Stabler, Samsa and Martin, the ALJ assigned little weight to each of their opinions, noting that they were "inconsistent with the medical evidence of record" (Tr. 26 (discussing Dr. Samsa's opinion)), "unsupported and inconsistent with the medical evidence of record" (Tr. 27 (discussing Dr. Stabler's opinion)), or "largely inconsistent with the medical evidence of record" (Tr. 28 (discussing Dr. Martin's opinion)).  Plaintiff argues that these explanations are conclusory and insufficient to satisfy the treating physician rule because the ALJ failed to identify which portions of the medical record were inconsistent with the physicians' opinions.

A review of the ALJ's decision in this case reveals that Plaintiff's argument on this point is not well taken.  Plaintiff's argument suggests that the ALJ dismissed the opinions of her physicians as inconsistent with, or unsupported by, her medical records without any discussion of the relevant records.  That is not the case.  Rather, in her decision, the ALJ engaged in a lengthy discussion of Plaintiff's medical records and treatments (Tr. 22-26), and concluded, in relevant part, as follows:

> [Plaintiff's] medical records do not contain evidence of recent surgeries, long-term hospitalizations or stringent physical restrictions related to her diagnosis of coronary artery disease.  Rather, they demonstrate that [Plaintiff's] condition is currently managed by frequent monitoring and prescription medications and that [Plaintiff] has been encouraged to engage in physical activity, rather than restricted from it.
>
> *   *   *
>
> [Plaintiffs] medical evidence does not indicate that [Plaintiff's] hypertension is so uncontrolled as to severely affect her daily activities or workplace capabilities.
>
> *   *   *

28

> Although [Plaintiff] continues to complain of back pain, the medical evidence suggests that [Plaintiff's] symptoms did not affect her mobility or ability to perform daily activities and are currently managed with medications, injections and physical therapy.
>
> *   *   *
>
> The medical evidence of record indicates that [Plaintiff's] diagnoses of degenerative disorder of the knees and fibromyalgia did not significantly impact her mobility and that her symptoms are being managed by prescription medications specifically selected to address her condition.
>
> *   *   *
>
> [I]t was consistently observed that [Claimant's] abdomen was soft, nontender and exhibited positive bowel sounds. Additionally, in September 2020, [Claimant] reported that she was feeling much better.
>
> The medical evidence of record indicates that [Plaintiff's] diagnosis of GERD and IBS presented few symptoms and has shown improvement over time.
>
> *   *   *
>
> [Plaintiff's] medical records do not contain evidence of long-term hospitalizations, commitments, severe psychotic episodes or incidents of self-harm or harm to others.  To the contrary, they indicate that [Plaintiff's] condition has been managed and has shown some improvement with prescription medications and therapy.  Additionally, [Plaintiff] has worked during some of the period under consideration.

(Tr. 23, 24, 25.)  Contrary to Plaintiff's arguments, these conclusions – accompanied by the ALJ's detailed discussion of the medical evidence – sufficiently explain the ALJ's decision to assign little weight to the opinions of Drs. Stabler, Samsa and Martin. Furthermore, after declining to assign little weight to the opinions of Plaintiff's treating physicians, the ALJ supported her findings with the opinions of Drs. Terry and Chambly.

29

(Tr. 27.)  Accordingly, this argument lacks merit.[2]

### 2.      Whether the ALJ Erred in Failing to Discuss the Third-Party Statements

Plaintiff argues that the ALJ violated Social Security Rulings 96-7p and 06-3p in failing to discuss the statements from Plaintiff's co-worker and supervisor at K-Mart, and to explain the weight she assigned to them.

S.S.R. 96-7p provides that "[o]ther sources may provide information from which inferences and conclusions may be drawn about the credibility of the individuals statements. . . .   Examples of such sources include public and private agencies, other practitioners, and nonmedical sources such as family and friends."  SSR 96-7p, 1996 WL 374186 at *8 (S.S.A.).  The Ruling requires an ALJ to consider "the entire case record, including . . . statements and other information provided by . . . other persons."

---

[2]      Plaintiff also argues that the ALJ erred when, in assigning little weight to Dr. Stabler's opinion, the ALJ observed, "Additionally, because of his treating relationship with [Plaintiff], Dr. Stabler likely relied upon [Plaintiff's] subjective complaints in rendering his opinions."  (Tr. 27-28.)  According to Plaintiff, this reasoning violates Social Security Ruling 96-8p, 1996 WL 374184 (S.S.A.).  Plaintiff does not explain how the ALJ's reasoning on this point violates S.S.R. 96-8p.  However, even if Plaintiff's conclusory argument was sufficient to raise some error, *see Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)), because the ALJ's other explanation – that Dr. Stabler's opinion was unsupported by and inconsistent with the medical evidence – is sufficient to satisfy the treating physician rule, any error would not require remand in this case, *see Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (noting that when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).

*Id*. at * 1.

Plaintiff argues that the ALJ erred in this case by failing to discuss the statements provided by Ms. Ring and Ms. Hyatt, who are a former coworker and supervisor of Plaintiff from her position at K-Mart.  The ALJ did not discuss these statements in her decision.  This omission, however, is not an error.  As a preliminary matter, although an ALJ is required to *consider* all of the evidence in the record, she is not required to *discuss* each item of evidence in her opinion.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.") Further, under Ruling 06-3p, an ALJ is required to discuss only that information that is relevant to the outcome of the case:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent review to follow the adjudicator's reasoning, *when such opinions may have an effect on the outcome of the case.*

S.S.R. 06-3p, 2006 WL 2329939 at * 6 (S.S.A.) (emphasis added).

Here, the statements of Ms. Ring and Ms. Hyatt were cumulative.  Their descriptions of Plaintiff's difficulties at work were duplicative of Plaintiff's testimony at her administrative hearing and in her complaints to her physicians throughout her treatment.  The ALJ based on her conclusion regarding Plaintiff's RFC on the objective medical evidence in the record, not on any lack of evidence supporting Plaintiff's subjective complaints.  (*See, e.g.,* Tr. 28 (noting that evidence of Plaintiff's "conservative

treatments," her "relative lack of strongly positive clinical signs " and her "activities of daily living" supported the finding that she could perform work as described in her RFC).)  Accordingly, the third-party statements were not likely to have an effect on the outcome of Plaintiff's case, and the ALJ did not err in failing to discuss the statements, or the weight she assigned to them, in her opinion.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: January 29, 2013

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See United States v. Walters, 638 F.2d 947 (6th Cir. 1981); Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**